R. L. King v. Morgan Mollohan *et al.*

No. 11,532.   (60 Pac. 731.)

61   683
71   656

1. Marriage Settlement—*Not Invalid.* Marriage settlements controlling the division and affecting the descent of property, freely and intelligently made, and which are just and equitable in their provisions, are not invalid.

2. ———— *Not Contrary to Public Policy or Illegal.* When the relations between a husband and wife are such as to make a separation inevitable, or where the conduct of one is such as to render the separation necessary for the health and happiness of the other, a post-nuptial agreement, reasonable and just in its provisions, for an immediate separation, the division and disposition of property and the relinquishment by one of any claim or interest, actual or contingent, in the estate of the other by reason of the marital relation, is not contrary to public policy or illegal.

3. ———— *Right of Inheritance Lost.* Such an agreement, wherein the husband for sufficient consideration releases the wife and her estate from any claim or interest which he might have by reason of being her husband, effectually bars him from any share or interest in the property or estate left by her at death.

4. ———— *Divorce Contemplated.* Where a separation is inevitable or absolutely necessary, an agreement for immediate separation will not be invalid because there was, at the time of its execution, an understanding between the parties that an early divorce would be obtained.

5. ———— *Res Judicata.* The judgment in *Mollohan v. King*, as modified by this court (58 Kan. 816, 50 Pac. 881), is not a bar to the further trial of the issues in the case, or to the judgment rendered herein.

Error from Marion district court; O. L. Moore, judge.   Opinion filed April 7, 1900.   Affirmed.

STATEMENT.

This is a proceeding involving the validity of conveyances and encumbrances of land formerly owned by Martha Bartel, and for a partition of the land among those claiming to inherit it.  Prior to February 25, 1893, John J. Bartel and Martha Bartel

were married, and had lived together as husband and wife. They were incompatible, however, and the conduct of John J. Bartel toward his wife was such as to render a separation necessary for her health and happiness. On the day mentioned they made a post-nuptial agreement, embraced in four instruments of writing, which was, first, a relinquishment from Martha Bartel to her husband of all right, title and interest in his property; second, a relinquishment by John J. Bartel of all his contingent interest in his wife's property as husband and heir; and two trust deeds intended to transfer the lands from one to the other. The portion of the contract affecting the lands in question, and by which John J. Bartel undertook to relinquish his interest, in substance provided that in consideration of $3900 paid to him by Martha, his wife, he released her and her estate from any claims he had on them by reason of being her husband, and authorized her to dispose of it free from any claims, either immediate or contingent, which he had in the property. He stipulated that he would never at any time claim any of that property or any other that she might acquire, and consented and agreed to abide by any will which she had made or might make, and that she might devise and dispose of her property without consulting him; and he then and thereby ratified and confirmed any will which she had made or might make. He stipulated that he would sign any and all conveyances made by his wife without remuneration, and transferred and released all interest in the personal property which she had. It was agreed that the settlement was made in view of a peaceable separation, and he specifically agreed "to stay away from his wife's place and not molest her or trespass on her premises." About the

time this contract was made there was an under-
standing between the parties that after the separation
a divorce was to be obtained by John J. Bartel, which
his wife would not resist, but, under the advice of
counsel, no mention was made of this understanding
or agreement in the written contract.

Immediately after the agreement the Bartels sepa-
rated, and never afterward lived together or assumed
the relations of husband and wife, nor did John J.
Bartel during the lifetime of his wife assert any right
to or interest in any of the property relinquished or
which was owned by Martha Bartel. She died in
1894 intestate, without children, leaving as her only
heirs seven brothers and sisters. Subsequently to her
death, John J. Bartel executed a quitclaim deed to
the lands in question to Lulu Carpenter. T. O. Kelly,
R. L. King and W. H. Carpenter obtained a convey-
ance and claimed title through Cyrus B. Hawley, who
was the husband of the adopted daughter of Martha
Bartel. A child had been born to Hawley and his
wife, and both the child and the mother died prior to
the death of Martha Bartel. In this action the broth-
ers and sisters of Martha Bartel set up their interests
in the land in question, asked that the claim of title
made by Kelly, King and the Carpenters be adjudged
void, the conveyances set aside, and the cloud cast
upon the title removed. They also asked for a parti-
tion of the land among the actual owners thereof.

To the answer which Kelly, King and Carpenter
filed there was a demurrer, which was overruled, and,
the demurring parties having elected to stand upon
the demurrer, judgment was given in favor of Kelly,
King, and Carpenter, awarding them the land in con-
troversy. That decision was brought to this court
for review, where it was held that as the answer con-

tained a general denial the demurrer was properly overruled. It was also held that the claim of title under Cyrus B. Hawley was not good, and that the affirmative judgment rendered by the court was erroneous. To that extent the judgment was reversed and the cause remanded for trial as though no judgment had been rendered. (*Mollohan v. King*, 58 Kan. 816, 50 Pac. 881.) After the cause was remanded to the district court, Lulu Carpenter · conveyed by quitclaim deed to R. L. King all the interest which she had in the property, and thereafter King filed a supplemental answer setting up his alleged title through transfer from Lulu Carpenter. No claim was thereafter made by Kelly, King or Carpenter under the conveyance from Hawley, and the cause was tried solely on the issue made by the supplemental answer of King on the claim of title acquired from Lulu Carpenter during the pendency of the proceedings. ·

At the trial the court made elaborate findings of fact, from which those stated have been taken, and also that the parties to the post-nuptial agreement were assisted by counsel in making the same, that it was fairly and intelligently entered into, and that it was fair, reasonable and just to both parties. As a conclusion of law it was found that the contract was valid and that it was wholly executed prior to the death of Martha Bartel; that John J. Bartel had no title, right or interest in the real estate in question, and that Lulu Carpenter took nothing by her quitclaim deed from him, and consequently conveyed nothing to R. L. King. The title of the heirs was quieted as against the claims of King and Carpenter and judgment given against them. R. L. King brings this proceeding to obtain a reversal of the judgment.

*W. H. Carpenter*, and *T. O. Kelly*, for plaintiff in error.

*Madden Bros.*, *H. A. McLean*, and *C. M. Clark*, for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: The validity of the post-nuptial agreement by which a division of the property was effected is the controlling question in the case. Under our statute the wife is capable of contracting with her husband, and it has been held that the conveyance of property directly from one to the other will be upheld so far as it is equitable to do so. (*Munger v. Baldridge*, 41 Kan. 236, 21 Pac. 159.) In Kansas there are not the obstacles to a contract between husband and wife that exist in some of the states, nor is there the same necessity for the intervention of a trustee in conveying or transferring property from one to another. Marriage settlements controlling the division and affecting the descent of property, which are intelligently made and are just and equitable in their provisions, are sanctioned by the courts. (*Hafer v. Hafer*, 33 Kan. 449, 6 Pac. 537.) The settlement in the present case appears to have been intelligently made, as the parties had the advice and assistance of able lawyers; and that its provisions are fair, reasonable and just to both of the parties is not open to dispute.

The contention here is that the contract of the spouses was a usurpation of the power conferred on the courts alone, and an attempt to abrogate the marriage contract, and for that reason must be held a nullity. It is true that the contract was made in contemplation and in the execution of an immediate

separation, and also that there was an unexpressed purpose that a divorce should at once be obtained which would effect an absolute dissolution of the marriage relation. The conjugal obligations cannot be canceled nor the marriage relation annulled by the mere agreements of the parties. The marriage relation is not on the footing of an ordinary contract, as the public has an interest in the status of the parties and in the fulfilment of the obligations and duties which the husband and wife mutually owe to each other. Public policy, therefore, forbids an agreement which encourages or facilitates a dissolution of the marriage relation, or which provides for a separation which is to take place some time in the future. So, in *Neddo v. Neddo*, 56 Kan. 512, 44 Pac. 2, certain provisions of the contract which seemed to invite disagreement and dissolution were condemned, and it was said that "no marriage settlement ought to be upheld which invites and encourages a violation of the marriage vow." The state guards the sanctity of marriage, and demands the fulfilment of its obligations, and therefore the law will not allow parties to release themselves from marital relations or annul the marriage contract at pleasure. Much controversy has arisen as to the validity of separation agreements, and although judges have frequently and in strong language deprecated the cause and effect of them, and condemned agreements by which they were accomplished, it may be regarded as settled law in England and this country that a valid agreement may be made for an immediate separation between husband and wife whose relations are such as to make it inevitable, or where the conduct of one is such as to render a separation necessary for the health and happiness of the other.

In *Walker v. Walker*, 9 Wall. 743, 19 L. Ed. 814, Justice Davis said :

"It is contended that deeds of separation between husband and wife cannot be upheld, because it is against public policy to allow parties who sustain that relation to avoid their duties and responsibilities by entering into an agreement which contemplates a partial dissolution of the marriage contract. If the question were before us, unaffected by decision, it would present difficulties, for it cannot be doubted that there are serious objections to voluntary separations between married persons. But contracts of this nature for the separate maintenance of the wife, through the intervention of a trustee, have received the sanction of the courts in England and in this country for so long a period of time that the law on the subject may be considered as settled."

In *Randall v. Randall*, 37 Mich. 563, Judge Cooley, in voicing the decision of the court, said :

"It is not the policy of the law to encourage such separations, or to favor them by supporting such arrangements as are calculated to bring them about. It has accordingly been decided that articles calculated to favor a separation which has not yet taken place will not be supported ; (*Durant v. Titley*, 7 Price, 577 ; *St. John v. St. John*, 11 Ves. 526 ; *Westmeath v. Westmeath*, Jac. 126,) but when a separation has actually taken place, or when it has been fully decided upon, and the articles contemplate a suitable provision for the wife and children, or an equitable and suitable division of the property, the benefits of which both have enjoyed during the coverture, no principle of public policy is disturbed by them."

Among the other authorities sustaining separations the following may be cited : *Compton against Collinson*, 2 Brown's Ch. 377 ; *Worrall v. Jacob*, 3 Merrivale, 266 ; *Jee v. Thurlow*, 2 Barn. & Cr. 547 ; *Webster v. Webster*, 23 Eng. L. & Eq. 216 ; *Carson v. Murray*, 3 Pai. Ch.

(N. Y.) 483; *Nichols v. Palmer*, 5 Day (Conn.) 47; *Hutton v. Duey*, 3 Barr (Pa. St.) 100; *Commonwealth v. Richards*, 131 Pa. St. 209, 18 Atl. 1007; *John Bettle v. Andrew W. Wilson*, 14 Ohio, 257; *Thomas v. Brown and others*, 10 Ohio St. 247; *Chapman v. Gray*, 8 Ga. 341; *Wells v. Stout*, 9 Cal. 479; *Garbut v. Bowling*, 81 Mo. 214; *Dutton v. Dutton and another*, 30 Ind. 452; *Hilbish v. Hattle*, 145 Ind. 59, 44 N. E. 20, 33 L. R. A. 783; *Fox v. Davis*, 113 Mass. 255; *Rains v. Wheeler*, 76 Tex. 390, 13 S. W. 324; *Storey v. Storey*, 125 Ill. 608, 18 N. E. 329; *Stebbins v. Morris*, 19 Mont. 115, 47 Pac. 642; Schoul. Dom. Rel., 5th ed., § 218; Tiff. Pers. & Dom. Rel. 168.

It was not alleged or proved that there was any fraud or collusion in making the contract, or that it resulted from the mutual caprice of the parties. The separation was simultaneous with the execution of the contract, and hence it is not to be regarded as' an agreement to break the conjugal relation at some future time. It is argued that the stipulation that the husband shall "stay away from his wife's place and not molest her or trespass on her premises" in effect provided against a reconciliation between the parties or a resumption of the marital relations. We do not view it in that light. It was in effect a stipulation that thereafter he should not annoy or molest her. His conduct toward her had been such as to make it necessary that they should live apart. Her health and happiness required a separation, and the provision quoted was no more than a stipulation that there should not be a recurrence of the conduct which made separation necessary. There was an understanding, it is true, that a divorce would be obtained, and it is contended that to that extent at least it conflicts with public policy. An understanding that the separation,

which was inevitable and immediate and legal in itself, should thereafter receive the sanction of the court and effect a dissolution of the marriage relation, cannot be regarded as collusive or fraudulent or violative of public policy. Even if the stipulation and understanding referred to were treated as unlawful, Bartel, who had received the benefits of a contract. fully executed and carried out, would hardly be in a position to attack it, and those who claim under him occupy no better position. If one of the parties were seeking to enforce an agreement which was in fact illegal, the assertion of illegality would be a sufficient defense, but courts will not interfere to relieve either party from such an agreement when it has already been executed. Under the circumstances we think there was no collusion or fraudulent purpose in making the agreement, and that the action of the parties did not contravene public policy. The contract being valid and fully executed, John J. Bartel was effectually excluded from any interest in his wife's estate. Such interest as he would have had but for the agreement was specifically relinquished, and no reason is seen why it is not effectual. (*Hafer v. Hafer*, supra; *Clendenning v. Wyatt*, 54 Kan. 523, 38 Pac. 792, 33 L. R. A. 278.)

There is another contention that the rights of the heirs were not established because it was not expressly proved that the mother of Martha Bartel was not living. The case was tried on the theory that the line of descent was through the father of Martha Bartel, Charles Mollohan, and he died in 1890. Although it is not specifically shown that the mother of Martha Bartel was dead, the case proceeded on the theory that the defendants in error, her brothers and sisters, were the only heirs, unless John J. Bartel can be re-

garded as an heir.   That being true, the court found
the defendants in error to be the only heirs, and the
point made must therefore be overruled.

The final claim that the heirs are barred by the de-
cision and judgment rendered before the first·review
of the case in this court is not sound.   The ruling on
the demurrer was sustained, but the judgment on the
pleadings was reversed and set aside.   While the pe-
tition of the plaintiffs in error in that proceeding was
upheld so far as the claim of King, Kelly and Car-
penter under Hawley was concerned, the answer
contained a general denial, and for that reason the
demurrer was overruled.   When the case was re-
manded it stood upon an issue of fact ready for trial.
The first judgment was not a bar to a trial of the
issues made by the pleadings as they then stood or as
subsequently amended.   An examination of the rec-
ord satisfies us that the doctrine of *res judicata* is not
applicable, and that the defendants in error were not
estopped to claim and show the title alleged in the
pleadings.

The judgment of the district court will be affirmed.

DOSTER, C. J., not sitting, having· been of counsel
in the case.

### REHEARING.   (July 7, 1900.)

PER CURIAM :   A rehearing in this case was ordered
because we assumed that a certain finding copied in the
record was part of the same.   It now appears that after
the finding had been filed a motion to strike out the
fourteenth finding was made and sustained.   That
finding was to the effect that the conduct of John J.
Bartel toward his wife was such as to render a sepa-
ration necessary for the health and happiness of the
wife.   Although the motion was sustained, the find-

ing was allowed to remain in the record, and the fact that it was printed there, as well as the further fact that counsel in their printed brief and argument assumed it to be a part of the record, led us to the same assumption, and to overlook the correction made in the manuscript brief filed after the oral argument.

The absence of the finding, however, does not invalidate the post-nuptial contract, nor warrant a change in the ultimate decision of the case.   The specific finding that the husband and wife were incompatible, and that a separation was necessary to the health and happiness of the wife, was cited to show that the separation was not collusive, or fraudulent, or violative of public policy.   We did not hinge the decision, however, on this finding, as a reading of the testimony sufficiently shows the absence of collusion and fraud in the separation, as well as in the agreement for the division of property; and this is sufficient to sustain the general finding.   A separation between the parties had been fully decided upon, and the agreement which was made contemplated and was followed by an immediate separation.   The facts show, and the court found, that the adjustment of the property rights under the agreement was fair, reasonable, and just, and it was held in *Randall v. Randall*, 37 Mich. 563, and other cases cited in the former opinion, that when a separation "has been fully decided upon, and the articles contemplate a suitable provision for the wife and children, or an equitable and suitable division of the property the benefits of which both have enjoyed during coverture, no principle of public policy is disturbed by them."

We are satisfied with the views taken and already expressed as to the stipulation that the husband should stay away from his wife's place and not molest her

or trespass on her premises, and as to the understanding had between them with reference to a divorce. In our view, the separation agreement does not violate public policy; but if for some reason it did, the fact that the husband had accepted the benefits of an agreement which fairly and equitably divided the property, and which was fully executed, would preclude him from setting it aside or recovering property disposed of under its provisions.

The judgment of affirmance will not be disturbed.